[Civil Nos. 4549 and 4550. Filed April 24, 1944.]

[148 Pac. (2d) 360.]

HOLBROOK LIGHT AND POWER COMPANY, a Corporation, ARIZONA ELECTRIC POWER COMPANY, a Corporation, Appellants, v. WILLIAM MADISON GORDON, a Minor, by WILLIAM E. GORDON, His Guardian *Ad Litem*, Appellee.

ARIZONA ELECTRIC POWER COMPANY, a Corporation, Appellant, v. WILLIAM E. GORDON and JEWEL GORDON, Husband and Wife, Appellees.

Messrs. Wilson, Compton and Wilson, and Mr. Theodore G. McKesson, for Appellants.

Mr. Dodd L. Greer, for Appellees.

ROSS, J.—William Madison Gordon, a minor, through his guardian *ad litem* recovered judgment in the Superior Court of Navajo County for damages for personal injuries sustained on January 15, 1940, at Holbrook, in said county, when he came in contact with a live wire on one of the transformers of the defendants, Arizona Electric Power Company and Holbrook Light and Power Company; and his parents in a separate action recovered judgment against the defendant Arizona Electric Power Company for expenses incurred by them by reason of said injuries.

At the time of injury William Madison Gordon was eight years and ten months of age; when the actions were tried he was over eleven years of age.

The power companies have appealed and by their assignments contend the evidence shows conclusively they are free from fault and are not liable for the injuries sustained by William Madison Gordon nor for the expenses incurred by reason of his injuries.

The actions were consolidated for trial and on appeal.

The generating plant of the Arizona Electric Power Company is located at Winslow, Navajo County, and hereafter we will refer to it as the Winslow Company. This company supplies the Holbrook Light and Power Company with electricity for use and distribution to customers at the town of Holbrook. By means of a transformer station at Holbrook, the electric current is reduced from a voltage of 23,000 to 2,300. The transformer station is approximately 26 by 27 feet and is enclosed by an industrial 2 inch mesh wire fence 7 feet high. The ends of the wire mesh were twisted together at the top to form sharp points extending 3½ to 4 inches above the top railing to form the top of the fence. On each of the four sides of this enclosure were printed signs in these words: ''Danger High Voltage.'' The Winslow Company owned about one-half acre of ground and this station is located thereon. On the east side of the station enclosure is a gate, of the same material and finish as the fence and forming a part thereof, and such gate was kept closed and padlocked. Inside this enclosure were three transformers set on concrete piers about 8 inches thick, 30 inches high and so erected on the piers as to occupy a space of about 9 feet. From the ground to the nearest high voltage connection it was approximately 10 feet, 8 inches.

The companies had a ladder which was kept in the enclosure for the use of their employees in reaching a platform located above and a little to the side of the transformers. This platform was 10 feet above the ground and about 11 feet long, and an employee standing on it could make adjustments of the transformers and the wires connected therewith.

Arthur J. Sullivan, a civil engineer in the employ of the Santa Fe Railroad Company, testified that at the time of the accident he was visiting with others at a place just north of the transformer station and that he and R. W. Johnson "ran over to the fence" where he saw "a small boy lying inside the enclosure"; that he assisted Johnson over the fence, who picked up Billy Gordon and handed him to a man who had got on top of the fence, who, in turn, handed the boy to him, Sullivan.

The transformer station was on or near the west side line of defendant's (Winslow Company's) one-half acre lot, the rest of which was open ground onto which children might and occasionally did enter without hindrance. There is some testimony to the effect that the unfenced portion was sometimes used by children as a playground and that children passed back and forth by and over it. But the fact is that on this occasion the Gordon boy and his companion Jared Heywood went directly to and entered the enclosure. The Gordon boy had been in the enclosure before, so he informed his companion Jared Heywood.

He was in the third grade of public school, could read, was of average intelligence, and had seen the warning signs "Danger High Voltage" posted on enclosure, but claimed he did not see them on the day of the accident. He testified at the trial that he and Jared Heywood, who was then about 10 years of age, on January 15, 1940, after school hours, were hunting

caves in the vicinity of the transformer station. (We understand the so-called caves were excavations that had theretofore been made by "some big boys.") Not finding any caves, they took the road that lead to the transformer station and when they got there, the Gordon boy testified, "We seen all those shiny things, hearing the buzzing sound and seen the ladder." He said the ladder "was leaning up against the fence"; that he "Stuck the toes of my boots in the fence and went down the ladder and pushed the ladder over on the scaffolding and went up the ladder to the scaffolding— . . . there was a piece of wood there and I stepped on it and I guess I stepped on the transformer—that is the last I remember." He also testified that both he and Jared Heywood went down the ladder to get inside the enclosure.

Appellee has two versions of the position of the ladder at the time and just before the accident. In his deposition taken January 15, 1942, and before the trial, he was asked questions and he answered them as follows:

"Q. Now, Billie, you did go within the fence and into the enclosure? A. Yes, I got in it.

"Q. But you don't remember how you got in there? A. I am not sure.

"Q. Now after you got in there what did you do? A. Pushed the ladder—we got the ladder and pushed it over against the scaffold.

"Q. Who got the ladder? A. We both did—it was too heavy for one.

"Q. Where was the ladder when you got it? A. Leaning up against the fence."

The Heywood boy testified as follows:

"A. Well, I didn't want to go in there very bad but he said it would be o.k., that he had been in there with someone else, and he climbed over the fence and climbed down on the inside, and then I climbed right after him. He was going to put the ladder there so I

could climb down but I told him I could jump, so I jumped.

"Q. Do I understand it right—he climbed over the fence and down the fence? A. Yes.

"Q. And how did you get down in there? A. I jumped."

The testimony of these two witnesses, as to what was done and as to how the accident happened, practically concurs except as noted.

The appellants claim that under the law and the evidence their motion for an instructed verdict should have been granted. In that connection they point out section 69–228, Arizona Code Annotated 1939, which reads as follows:

"The commission may by order, rule or regulation, require every public service corporation to maintain and operate its line, plant, system, equipment, and premises in such manner as to promote and safeguard the health and safety of its employees, passengers, customers and the public, and to this end may prescribe the installation, use, maintenance and operation of appropriate safety or other devices or appliances, including interlocking and other protective devices at grade crossings or junctions and block or other systems of signalling, establish uniform or other standards of equipment, and require the performance of any other act which health or safety may demand."

They show that thereunder the corporation commission theretofore adopted "Safety Rules for the Installation and Maintenance of Electrical Supply Stations" from the National Electrical Safety Code, and that rule 143 thereof provides that: "Transformers shall be installed according to one of the following methods: . . . (2) In outdoor inclosures such that unauthorized persons can not, without special effort, come in contact with any part of the casing or wiring. . . ."

A compliance by the appellants with the rule as stated may be admitted, yet the installation of the

transformers as provided would not exempt the appellants from keeping the enclosure free from the attractions created by the loose ladder and humming transformers.

The appellee's cause of action, as gleaned from the complaint, is (1) the insufficiency of the fence enclosing the transformers in height and structure to prevent curious and immature children from climbing over the same into the transformer station, and (2) leaving the ladder in the transformer station available to such children for use in investigating the humming noise from the transformers, without knowledge of the danger of their action.

We know as a fact that the fence was not sufficient to keep the appellee and his companion out of the station. It appears that they climbed the fence and descended it like mountain goats, and with as much indifference to their safety. Neither the texture of the fence nor its height seemed to interfere with their purpose.

At the top of the fence, 7 feet from the ground, was an extension of the wire making the body of the fence compressed into points 3 or 4 inches high, extending entirely around the enclosure. The protruding points of wire were intended as barriers against persons endeavoring to climb over the fence. Whether they were or were not was a question of fact. Appellee and his companion found no trouble in overcoming them. The engineer Sullivan, and those who helped him rescue appellee from the station after the accident, had little or no difficulty in getting over the fence.

A safe, or at least a safer, way of preventing persons from entering transformer stations would be to encircle the top of the fence with barbed wires so that a person approaching from below would have to overcome such obstruction—a most difficult thing to do.

It is in evidence that some electric companies have adopted that method of safety. The expense of such installation would not be much, but much or little the neglect to do it cannot be excused.

The appellants, in insisting that the fence enclosing the transformers was sufficient in fact and in law, cite the following cases: *Hanson* v. *Washington Water Power Co.*, 165 Wash. 497, 5 Pac. (2d) 1025, and *Mc-Donald* v. *Shreveport Rys. Co.*, 174 La. 1023, 142 So. 252, 254.

An examination of these cases will disclose that in both the transformers were enclosed as follows: In the Shreveport case "the premises were enclosed with a mesh wire fence, topped with strands of barbed wire to a height of seven feet, and entered through [gates] that [were] kept locked." In the *Hanson case* [165 Wash. 497, 5 Pac. (2d) 1026], "along the top of the fence three strands of smooth wire [separated] six inches apart are strung on arms inclined inward at an angle of about forty-five degrees. The mesh wire is six feet high, and the additional three wires make the height of the fence seven and one-half feet."

A comparison of the facts in these two cases with the facts in the present case discloses that they are not authority for the contention that the obstructions in the present case were sufficient. There are no strands of wire on the top of appellants' fence around the transformers. Had there been, the cases cited would have been in point.

■ The appellee had no right to enter the enclosure around the transformers, and in doing so he was a trespasser. The general rule is that a trespasser, who enters upon another's premises and is there accidentally injured by or through the operation or use of the owner's property in his business, may not recover damages for such an injury.

■ This rule "applies to children the same as to adults unless the facts bring the case within the exception as to places and things attractive to children." 29 C. J. S., Electricity, p. 588, § 43. Were the "places and things," that is, the transformer station and the ladder located as they were in a neighborhood frequented by children, what is known as an attractive nuisance?

■ In *Salt River Valley Water Users' Ass'n* v. *Compton*, 40 Ariz. 282, 288, 11 Pac. (2d) 839, 841; Id., 39 Ariz. 491, 8 Pac. (2d) 249, we rather fully discussed the attractive nuisance doctrine. We there said:

" . . . While courts have differed as to the philosophical explanation of the raison d'être for the rule, the essential elements are unmistakable if it is to be applied. (a) The defendant must have tempted the child to come on his property; and (b) he must have yielded to that temptation."

After stating the general rule to the effect that trespassers cannot recover damages for injuries sustained while on the property of others, we said:

" . . . the same strictness to young children who, while they were technical trespassers, as a matter of fact had no knowledge of what a trespass was, or that it was wrongful to invade the property of others, was a harsh doctrine, and certain qualifications of the rule of nonliability for injuries occurring to children on the property of the negligent person were established."

■ We think this rule is almost universally applied. It appears that appellee was attracted to the transformer by reason of the humming noise it was making, and the ladder being available for his use in getting onto the platform over the transformers, he proceeded to satisfy his curiosity by investigating such noise. While so doing he was injured by com-

ing in contact with an electric current emanating from the transformers.

We do not think that we would be justified in assuming that appellee at the time knew of the hidden danger that resided in the transformers, for his very action is convincing evidence that he did not know. Because of his youth and ignorance of the effect of his action he was, in contemplation of the law, only a technical trespasser.

■ Appellants complain that the question of insurance was injected into the case and that the court's refusal to grant their motion for mistrial was error.

It appears that while the general manager of the appellants was on the witness stand he was asked by the attorney for appellees the identity of certain investigators, and to the question asked, "Who was the investigating party—just your company, I mean?" the general manager answered, "The matter had been turned over to the insurance company." Whereupon, the jury being excused, counsel for appellants made a motion for new trial which, after considerable discussion, was refused on the ground that it was not responsive and was made by the general manager of the appellants. It is now insisted that it was error for the court to refuse to dismiss the jury and grant the appellants a new trial, their claim being that the jury was prejudiced by reason of this proceeding.

We have held in a number of cases that the injection of the question of insurance in personal injury cases of this kind was error and called for a new trial. Appellants cite *Fike* v. *Grant,* 39 Ariz. 549, 8 Pac. (2d) 242, wherein a new trial was ordered because of the question of insurance being mentioned before the jury, In that case it was suggested by the prevailing party, and here it is suggested by the general manager of the appellants. In that case the liti-

gation was between private individuals. In this case it is between public utility companies and private individuals. The probabilities are that the fact, if it be a fact, that the utilities were insured would not have influenced the jury at all because of the financial ability of the utilities to respond to any damages that might be given against them. We feel that the decision in the Fike case was right, but since the situation of the parties there was different from the situation of the parties here, the rule there announced is not binding in this case. Besides the very party complaining first mentioned the subject of insurance.

Appellants have made other assignments, but what we have said either takes care of them, or a decision thereof could not result in any other conclusion than the one we have reached.

The judgments of the lower court are affirmed.

McALISTER, C. J., and STANFORD, J., concur.