Merle H. JOHNSON, Administrator of the
Estate of Stanley Matt Johnson,
Appellant,

v.

UNITED STATES of America,
Appellee.

Merle H. JOHNSON, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 16350.

United States Court of Appeals
Ninth Circuit.

July 31, 1959.

As Amended on Denial of Rehearing
Sept. 29, 1959.

Act for the recovery of damages. One action (Civil No. 49) was prosecuted by Merle H. Johnson as Administrator of the Estate of Stanley Matt Johnson under the Montana Survival Statute (§ 93-2824, R.C.M.1947). The other action was brought by Merle H. Johnson, the father of the minor, under the wrongful death statute of Montana (§ 93-2809, R.C.M.1947). The cases were consolidated for trial and were tried before the United States District Court of Montana without a jury.

The Court rendered a judgment in favor of the defendants and this appeal followed. No question is raised as to the jurisdiction of the District Court or of this Court.

The substation where the tragedy occurred was located in the town of Forsyth in a residential area. The substation was enclosed on four sides by a seven-foot woven wire mesh fence which had two gates of the same material. Three strands of barbed wire were stretched on projections extending approximately one foot above the woven wire fence. These projections extended above the steel pipe posts and slanted outward at approximately a 45-degree angle, except at the four corners of the fence and at the two double gates forming a part of the fence. At these points the projections extended vertically above the posts. Thus, at these points the three strands of barbed wire, about four inches apart, instead of forming an eave-like projection toward the outside, lay one directly above the other in the same plane as the posts and the mesh fence. A "Danger, High Voltage" sign was suspended from each gate.

Inside the fence were three high-tension transformers located on the ground and three oil circuit breaker tanks, elevated some three or four feet above the ground, by means of a metal platform. At the top of each tank were two bushings and caps, through which electrical current was transmitted in the operation of the substation. The topmost portion of each bushing was some eight or nine feet above ground. The amount of cur-

Longan & Jones, Franklin S. Longan, Billings, Mont., F. F. Haynes, Forsyth, Mont., Harry John Mehr, Glendive, Mont., for appellants.

Krest Cyr, U. S. Atty., Butte, Mont., Waldo N. Spangelo, Asst. U. S. Atty., Billings, Mont., Michael J. O'Connell, Asst. U. S. Atty., Butte, Mont., Jack H. Bookey, Asst. U. S. Atty., Butte, Mont., John F. Blackwood, Asst. U. S. Atty., Billings, Mont., for appellee.

Before POPE, STEPHENS and HAMLIN, Circuit Judges.

HAMLIN, Circuit Judge.

On July 4, 1955, Stanley Matt Johnson, a minor of the age of four-and-a-half years, received severe burns from electrical energy transmitted through a substation operated by the Bureau of Reclamation, United States Department of the Interior, at Forsyth, Montana. Stanley lived approximately four hours before dying as a result of these severe injuries. Thereafter, two actions were brought under the Federal Tort Claims

rent passing through the bushings was approximately 19,400 volts.

From the evidence it appeared that the minor child had apparently climbed over one of the two gates in the fence, had thereafter climbed on a box and had come in contact with the circuit breaker tanks, thus putting him in direct contact with the high voltage electricity.

Plaintiff's complaint had alleged that Stanley had been attracted by "the color of and humming noises emitted from the dangerous equipment" and "discovering and being attracted by the ease by which said gate could be climbed in view of the size of the wire mesh allowing for easy hand and foot hold and the lack of an overhanging barrier across the top," had climbed over the gate, thereby gaining access to the electrical equipment within the substation. Plaintiff further contends that the defendant was negligent in failing to equip the gates with the same type of barrier with which the remaining enclosure was equipped, and in allowing the gate to remain so attractive to the decedent that he climbed over it.

▮▮▮ The actions were brought by the plaintiff under the theory of the attractive nuisance doctrine. The accident occurred in Montana, and the law of that state governs this Tort Claims action. McGill v. United States, 3 Cir., 1953, 200 F.2d 873. The doctrine of attractive nuisance has long been recognized in Montana. Gates v. Northern Pacific R. Co., 1908, 37 Mont. 103, 94 P. 751; Martin v. Northern Pacific R. Co., 1915, 51 Mont. 31, 149 P. 89; Gilligan v. City of Butte, 1946, 118 Mont. 350, 166 P.2d 797; Nichols v. Consolidated Dairies of Lake County, 1951, 125 Mont. 460, 239 P.2d 740, 28 A.L.R.2d 1216.

The rule has been stated in various ways. In Gates, supra, the Court said:

"It is my judgment that when the owner or occupier of grounds brings or artificially creates something thereon especially attractive to children, as shown by the nature of the thing itself and the fact that a child was, or children were, attracted to it,

and leaves it so exposed that they are likely to come in contact with it, either as a plaything or an object of curiosity, and where their coming in contact with it or playing about it is obviously dangerous to them, the person so exposing the dangerous thing should reasonably anticipate the injury that is likely to happen to them from its being so exposed, and is bound to use ordinary care to guard it so as to prevent injury to them [37 Mont. 103, 94 P. 755]."

In Restatement, Torts, Section 339, it is said:

"A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if (a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and (b) the condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and (d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein."

In Gilligan v. City of Butte, supra, the Court said:

"The test is whether the injury to plaintiff or to a class of which the plaintiff was one ought reasonably to have been anticipated. 'It is not necessary, in order to impose this duty, that injury should be inevitable, that the danger thereof should be great, or even that the chances of injury should exceed the chances of absence of injury; but it is sufficient that injury is likely or reason-

ably probable.' 45 C.J. pg. 657 [118 Mont. 350, 166 P.2d 808]."

The same duty of the owner or occupier of property on which an attractive nuisance is maintained to exercise reasonable or ordinary care under the circumstances is set out in 65 C.J.S. Negligence § 29(8)b, at page 466.

The same general rule regarding the duty to exercise reasonable care under the circumstances has been stated to be applicable to companies handling or dispensing electrical power. Bourke v. Butte Electric & Power Co., 1905, 33 Mont. 267, 83 P. 470; and Mize v. Rocky Mt. Bell Telephone Co., 1909, 38 Mont. 521, 100 P. 971. In the latter case the Court quoted at page 975 from Block v. Milwaukee Street Rwy. Co., 89 Wis. 371, 61 N.W. 1101, 27 L.R.A. 365, as follows [100 P. 975]:

"So far as reasonable knowledge, in the present state of the science and the practical use of electricity as a motive power for street railways, and reasonable foresight can go, it (the defendant) is bound to guard the public against the perils attendant upon this use of electricity; but it is liable only for what is known as reasonable care. The present state of the science, and the present practical knowledge of the most practical and effectual means and methods of guarding against such perils as are incident to its use, are a most important element in the question of what is reasonable care."

See also Murphy v. Central Kansas Electrical Cooperative Association, 1955, 178 Kan. 210, 284 P.2d 591.

Appellant alleges error in the following.

█ Over the objection of the plaintiff, defendant United States introduced the expert testimony of three electrical engineers concerning the custom and practice of electrical companies in providing safeguards for substations at various places. All of these witnesses testified that the matter of the construction of the fence and gates around the sub-station in question conformed to the custom of fencing comparable substations by other companies.

Such evidence is admissible and competent for consideration by the trier of fact on the issue of whether or not negligence has been proven. Dunagan v. Appalachian Power Co., 4 Cir., 1929, 33 F.2d 876, 68 A.L.R. 1393; Hellweg v. Chesapeake & Potomac Telephone Co., 1940, 71 App.D.C. 346, 110 F.2d 546. See also 2 Wigmore, On Evidence, (3rd Ed., 1940) Sec. 461, pg. 489. This evidence is not controlling on the question of whether the defendant exercised due care under the circumstances, and the District Court in its opinion has so stated.

█ The District Court further stated "customary practice is not ordinary care; it is but evidence of ordinary care. Northwest Airlines v. Glenn L. Martin Co., 224 F.2d 120, 50 A.L.R.2d 882, certiorari denied 350 U.S. 937, 76 S.Ct. 308, 100 L.Ed. 818." [163 F.Supp. 394] We see no objection to the admission of this testimony for the purposes stated.

Another specification of error was that "the Court erred in failing to hold that the addition (after the accident) of a barrier over the top of the east gate was evidence of negligence."

It appears that evidence was admitted, although objected to by defendant, that after the accident in question a change was made in the strands of barbed wire over the two gates. It appears that at the two gates additional sections of pipe with barbed wire attached were added to the vertical extensions at a 90-degree angle, which resulted in an arrow-type projection hanging outward over the top of the gates.

█ Counsel for the plaintiff admits that the overwhelming weight of authority is to the effect that evidence of repairs made after an accident are inadmissible to show failure of due care on the part of the defendant. See, e. g., Titus v. Anaconda Copper Mining Co., 1913, 47 Mont. 583, 133 P. 677. The lower Court correctly held that the evi-

dence of the changes at the top of the gates in question, made after the accident, was properly admitted, *not* as evidence of negligence on the part of the defendant, but *solely* for the purpose of showing the practicability of this additional safeguard. We see no error in this procedure.

█ Two other specifications of error by appellant require only brief attention. In one, appellant contends that the Court erred in allowing the appellee to amend its answer and to introduce testimony upon the issue of whether the father of the boy had been contributorily negligent in allowing him to play in the vicinity of the substation. The District Court made no finding that the father of the child was contributorily negligent and did not impute any such claim of negligence to the child. The District Court, finding the Government not to be negligent, did not even reach this question of contributory negligence. Appellant thus has no cause to complain.

█ In another specification of error, appellant complains of the action of the FBI agent, without permission of the child, its parents, or the administrator of the child taking statements from the child's physician and nurse.

A statement appears in the appellant's brief on this point, as follows:

"It is conceded that the privilege was waived at the time of trial by the plaintiff calling as witnesses the doctor and the nurse. The Government did not try to impeach any of these witnesses, * * *."

We hold that the appellant had no cause for complaint under this specification of error.

█ As specification of error number 5, appellant contends that the District Court was in error in denying plaintiff's motion to reopen the case to introduce newly discovered evidence and in denying plaintiff's motion for a new trial. As appellant concedes in its brief, these matters are within the discretion of the Court. The evidence, assuming that it was unavailable at the first trial, was merely cumulative. No abuse of discretion has been shown in this case. See F.R.Civ.P. 59, 28 U.S.C.A., and 3 Barron and Holtzoff, Federal Practice and Procedure, Sec. 1305.

Appellant relies largely on two cases to support its position. Holbrook Light & Power Co. v. Gordon, 1944, 61 Ariz. 256, 148 P.2d 360, and Hyndman v. Penn. R. Co., 396 Pa. 190, 152 A.2d 251. In the Holbrook case, a minor of the age of eight years and ten months recovered a judgment against a light and power company for injuries received by the minor when coming in contact with an electrical current at a transformer station operated by Holbrook. The facts show that the transformer station was surrounded by a two-inch mesh wire fence seven feet high. At the top of the fence the ends of the wire mesh were twisted together to form sharp points extending three-and-a-half to four inches above the top railing. It appears that the company had a ladder inside the enclosure leaning up against the fence. The injured minor, together with another minor, climbed the fence, went down the ladder upon the other side, then placed the ladder over against the transformer platform and climbed this ladder until they were in contact with the electricity. The Court, in holding that there was sufficient evidence to justify the judgment for the minor plaintiff, indicated that the fence as constructed was not sufficient. In speaking of the wire points on top of the fence, the Court said:

"The protruding points of wire were intended as barriers against persons endeavoring to climb over the fence. Whether they were or were not is a question of fact [61 Ariz. 256, 148 P.2d 363]."

The Court further said:

"A safe, or at least a safer, way of preventing persons from entering transformer stations would be to encircle the top of the fence with barbed wires so that a person approaching from below would have to overcome such obstruction—a most diffi-

cult thing to do. It is in evidence that some electric companies have adopted that method of safety. The expense of such installation would not be much, but much or little the neglect to do it cannot be excused."

In the instant case, there were three strands of barbed wire approximately four inches apart on top of the seven-foot fence.

In the Hyndman case, the facts show that a twelve-year-old Boy Scout climbed a railroad's catenary pole located within 25 feet of a Boy Scout campsite. Young Hyndman reached a platform affixed to the pole, which held a transformer. The boy came in contact with certain uprights thereon and received serious electrical burns. In that case the ladder leading up to the pole had on the lower seven feet thereof an "anti-climb gate." The rear side of the ladder, however, had no such device on it. The rungs of the ladder on the inside were used by the minor in climbing up the pole. The evidence in the case showed that the pole had been climbed many, many times in the past without any injury occurring. The railroad knew of the presence of the Boy Scouts in the vicinity of the pole, and its employees had noticed the Scouts in the area on many occasions in the past. The Court stated:

"The defendant was aware of the presence of children in the area. He was under a duty to take *reasonable* precaution to prevent accessibility to this condition. The record proves that he failed so to do. It is quite clear there was sufficient evidence to justify the jury's determination that the appellant should have been aware of this condition and realized the risk which was involved to trespassing children [396 Pa. 190, 152 A.2d 255]."

Each of the cases above mentioned relied upon by the appellant is distinguishable from the case at bar.

 The main specification of error by the appellant is that the District Court failed to find negligence on the part of the appellee. Appellant contends that appellee was negligent in failing to install a 45-degree-angled protection on each gate as well as upon the fence.

Some testimony was given as to the reason industrial fences such as the one around this particular substation should have straight posts at the gates and have the 45-degree barbed wire projected outward in between these straight posts. The Court had an opportunity to evaluate this testimony.

It must be remembered that in this case the District Court, after applying the doctrine of attractive nuisance, *found the facts* against the contentions of appellant and found that the appellee was not negligent.

In the Hyndman and Holbrook cases relied on by appellant, the Court held there was sufficient evidence to go to the jury, and the jury in each case by its verdict inferentially *found the facts* against the defendants therein.

The District Judge in this case heard all of the evidence for both sides and then viewed the premises. He saw the construction of the substation, the surrounding fence and gates, and the location and manner of installation of the barbed wires around the top of the fence and gates. He saw also the location of the particular bushings with which the minor supposedly came in contact. These were somewhat higher above the ground than the eight-foot fence surrounding the substation. He also had an opportunity to see the type of neighborhood surrounding the substation.

The findings of fact of the Court included the following:

"IV.

"The operating portion of the substation consisted of the type of equipment and apparatus normally necessary for the operation of an electrical substation, including poles and cross arms, overhead wires, porcelain insulators, three high tension transformers located on the ground and, among other items, three oil circuit breakers on a metal platform

elevated some three or four feet above the ground. The oil circuit breakers themselves are approximately four feet in height with two bushings and caps at the top of each one through which approximately 19,400 volts of electrical current was transmitted in the operation of the substation.

### "V.

"The non-operating portion of the substation consisted of a protective, industrial type fence constructed of steel pipe posts set in concrete at regular intervals and a framework of pipe connecting these posts at their tops, with horizontal bracing pipes about one-half the height of the fence at the corners and adjacent to the gates, covered from the outside with a seven foot woven-wire mesh fence of a two inch by two inch diamond-shaped design. Three spaced strands of barbed wire were stretched on projections extending above the steel pipe posts. These projections extended outward at approximately a forty-five degree angle and upward approximately one foot, except that at the four corners and at the gate posts the projections extended vertically above the posts and the three spaced strands of barbed wire, instead of forming an eave-like projection toward the outside, lay one directly above the other in the same plane as the posts and mesh fence. The total height of the mesh fence topped by the three strands of barbed wire was approximately eight feet.

### "VI.

"Two double gates of the same height as the fence completed the enclosure around the operating portion of the substation. The gates were on opposite sides of the enclosure, one being on the westerly side and the other on the easterly side. They were of the same construction as the fence, consisting of a steel pipe framework with pipe cross bars about midway up and covered on the outside by the same woven wire mesh as the fence. The gates swung both ways from the steel fence posts on each side, and met in the center with clips which held a center locking bar extending into a socket in the ground and secured by a padlock. The seven foot gates were topped with three strands of spaced, barbed wire, in a vertical plane, and not extending outward at a forty-five degree angle as on the fence. The barbed wire extended approximately one foot above the mesh covered gate and to approximately the same height as the balance of the fence. 'Danger High Voltage' signs were suspended from each gate.

### "VII.

"On July 4, 1955, Stanley Matt Johnson, a four and one-half year old child, gained access to the substation enclosure, apparently by climbing over the east gate, and inside the enclosure climbed the metal framework supporting the oil circuit breaker tanks onto the tops of the tanks and came in contact with approximately 19,400 volts of electricity, coursing through the bushings at the top of the tanks. He died about fours hours later in the hospital.

### "VIII.

"The substation was completed approximately five years prior to July 4, 1955, and during that time there was no report of children playing on the fence or attempting to climb over it. A substation, which had replaced an older substation in approximately the same location, belonging to a private electric company, was located a few feet away and there were no reports of children playing on its fence or gates or attempting to climb over them. Children were known to play in a vacant lot adjoining the easterly side of the substation.

"IX.

"The barbed wire extension above the gates was modified after the accident by the addition of a horizontal overhang outward, consisting of three strands, at the top of the three strands already in place, so that the six strands of barbed wire form a right angle. The corner and gate post extensions were also extended at a forty-five degree angle outwards at the time of the modification.

"X.

"The substation equipment within the enclosure was an attractive nuisance, but neither the fence nor gates, or the construction thereof, constituted an attractive nuisance, and it could not reasonably be anticipated that the fence and gates, or either of them, would attract children of ordinary and normal instincts, habits and training to play on them or attempt to climb them.

"XI.

"The construction of the substation fence and gates and particularly the easterly gate, provided such safeguards as would prevent injury to a small child of ordinary and normal instincts, habits and training, and such as would be constructed by an ordinarily prudent person taking into consideration all of the risks involved. The fence and gates were in a good state of repair.

"XII.

"The construction and condition of the fence and gates, and particularly the easterly gate, conformed to the custom and practice of the electrical industry in this general area.

"XIII.

"Defendant could not reasonably anticipate that the fence or gates could or would be scaled and a child or other trespasser succeed in reaching the operating portion of the substation."

Included in the Conclusions of Law signed by the District Court were the following:

"III.

"Defendant exercised reasonable and due care under the circumstances to guard its substation so as to prevent the entry of small children within the substation enclosure and had taken reasonable precautions to provide such safeguards as would reasonably prevent injury to a child of ordinary and normal instincts, habits and training.

"IV.

"Plaintiff failed to prove that decedent's injuries and death were proximately caused by any act of negligence of the defendant."

The District Court's statement of the law of attractive nuisance as it exists in Montana is free from error. In order for this Court to reverse the judgment of the District Court, we would be required to find that the findings of the District Court were clearly erroneous. This we can not do.

We believe that the evidence introduced in the case amply supported the findings of the District Court.

The judgment is affirmed.