**Albin D. MOLOHON, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 333.**

United States District Court
D. Montana,
Billings Division.
June 18, 1962.

Berger, Stotesbury & Moe, Billings, Mont., for plaintiff.

Moody Brickett, U. S. Atty., Butte, Mont., and Richmond F. Allan, Asst. U. S. Atty., Billings, Mont., for defendant.

JAMESON, District Judge.

Plaintiff seeks damages under the Federal Tort Claims Act [1] for the death of two hunting dogs as the result of eating poisoned bait on the Henry Algra ranch in Petroleum County, Montana. The bait had been placed on the Algra property on November 11, 1960, at the request of the owner, by Ralph Otterman, an employee of the United States Department of the Interior, Fish and Wildlife Service. Otterman was acting within the scope of his employment and in accordance with authority vested in him by law. [2]

The poisoned bait (a quarter of a horse carcass treated with a poison known as Compound 1080) was placed approximately 2,022 feet south of a fence along the county road which runs east and west between highway 87 and the Winnett road, in the vicinity of Flat Willow Creek, and approximately 174 feet west of a boundary fence separating the Algra

---

1. § 1346(b). "Subject to the provisions of chapter 171 of this title, the district courts * * * shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages * * * for injury or loss of property * * * caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

§ 2674. "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."

2. 7 U.S.C.A. § 426.

land from land owned by Andrew Iverson.

Similar bait had been placed on the Algra property at approximately the same place every year since 1957, and bait has been placed in the general vicinity of the Algra property regularly since 1948. The purpose of the baits is to kill coyotes and other predators detrimental to the livestock industry.

The facts are relatively simple and except for minor discrepancies are not essentially in dispute. On November 19, 1960, plaintiff drove his car in an easterly direction along the county road. He was accompanied by his wife and had three hunting dogs in the car. A bird hunting season was in effect in the area, and plaintiff intended to hunt and train his dogs. He came to the Shields ranch (west of the Algra ranch), which was posted with "No Hunting Without Permission" signs and turned into it to ask permission to hunt. No one was home, and plaintiff proceeded eastward. He drove past the Algra property, but because the Algra ranch buildings were almost totally hidden by hills plaintiff did not realize he had gone past the Shields property. He testified that although he was looking, he saw no signs on the fence.

Plaintiff reached the boundary fence between the Algra property and that of Andrew Iverson. He recognized it as signifying a change of ownership, although he still thought the property west of the fence was part of the Shields ranch. At the corner formed by the meeting fences there was a gate facing the county road and giving access to the Algra field where the bait was stationed. This was the main entrance to that field and the entrance used by Otterman in placing the poisoned carcass.

According to Otterman, he posted a warning sign, the same as or similar to defendant's Exhibit No. 2, on the gate described above. This is an orange colored sign 8″ x 11″, regularly used by the Fish and Wildlife Service, with the upper half of the sign printed in English and reading:

"Poison

―――

"Owners of dogs take notice
"Poison meat baits have been placed in this locality under direction of the Fish and Wildlife Service and local agencies to control predatory animals that kill livestock and game.

"Warning
"Keep dogs away. Do not interfere with baits. They are dangerous."

―――

The word "poison" is three-eighths inch high and the remainder of the sign one-fourth inch. Otterman testified that the sign was placed on November 11, 1960, when the bait was stationed. Mr. and Mrs. Algra and Mr. Iverson all testified that they had seen the warning sign at the gate on several occasions between November 11 and 19.

The presence and character of the sign at the main entrance to the Algra field where the bait was placed is in conflict. Plaintiff testified that there was no sign on that gate on November 19; and that when he returned with two companions for further investigation on the following day there was a sign posted on the gate different from that portrayed by the defendant's exhibit. One of his companions of November 20, Nat Sullivan, said the sign they saw was darker in color and smaller than that shown by the Government's exhibit. He said the sign was in two languages and contained a warning to dog owners that there was poison in the area.

The conflict surrounding the sign is more apparent than real. It is unlikely the sign could be read and it could easily be overlooked by a person traveling in a motor vehicle on the highway. It could hardly be overlooked by one who entered the premises at the gate where the sign was posted. A person with normal eyesight would have to be within ten to twelve feet to read the sign in its entirety. From the evidence

as a whole, I find that Otterman placed a sign of the standard type used by the Fish and Wildlife Service on the gate at the time he placed the bait, and that this sign was in place on the gate on November 19, 1960.

Plaintiff hunted west along Flat Willow Creek, moving toward the Algra field containing the poisoned carcass. His dogs hunted the brush ahead of him. At some point he angled away from the creek and struck the boundary fence between the Algra and Iverson property north of a little-used gate. His dogs had been sent into the brush and were not near him when he reached the fence. He thought he saw them eating something on the Algra property and called them in. A short time later he returned to his car and began the trip to his home in Billings.

■ It is unnecessary to review in detail the evidence regarding the death of plaintiff's dogs. I find that plaintiff has proved by a preponderance of the evidence that the dogs died as a result of eating the Compound 1080 poison on the Algra property.

It is undisputed that plaintiff neither sought nor was granted permission to enter the Algra property. Accordingly defendant contends that the dogs were mere trespassers to which the defendant, standing in the position of possessor of lands, owed a duty only to refrain from wilfully or wantonly inflicting injuries upon them. On this basis plaintiff's administrative claim for damages was rejected by the Field Solicitor of the Department of the Interior, Billings, Montana. The rejection was affirmed on appeal to the Office of the Solicitor, Washington, D. C.

The plaintiff, on the other hand, takes the position that the duty owed was that of reasonable care and that defendant was negligent in placing the poisoned bait in a well known hunting area during the hunting season, in failing to give adequate warning of the presence of the poison, and in enticing and luring plaintiff's dogs to the poisoned bait without using reasonable care and diligence to protect them.

■ The question of the duty owed is one of Montana law. See 28 U.S.C.A. §§ 1346(b) and 2674, supra. The case nearest in point is Beinhorn v. Griswold, 1902, 27 Mont. 79, 69 P. 557, 59 L.R.A. 771, in which trespassing cattle belonging to the plaintiff wandered onto defendant's mine and mill site and there drank from vats containing poisonous chemicals consisting principally of cyanide of potassium. In appearance the solution resembled water. The Supreme Court recognized that before a landowner could recover damages caused by trespassing animals he is required by Montana law to fence them out, but held that this did not charge the landowner with the duty to keep cattle lawfully at large from coming on his land, or make their entry rightful, so as to make him liable for injuries to such animals caused by the existence of dangerous agencies on the land, but not wantonly or intentionally caused. In the more recent case of Thompson v. Mattuschek, 1959, 134 Mont. 500, 506, 333 P.2d 1022, the court recognized Beinhorn v. Griswold as holding that livestock "wander at their own and their owner's risk of loss".

Plaintiff relies upon the following language in the Beinhorn case:

"We think there is no proof in the record which justifies the application of the doctrine of invitation, enticement, allurement or attraction. (Citing cases which, upon examination, appear to be typical turntable cases.) The soundness of the principles upon which the so-called turntable and similar cases are supported is not presented for decision." 27 Mont. at 93, 69 P. at 560.

Plaintiff contends (1) that the instant case presents an enticement or allurement not present in Beinhorn; and (2) since Montana has recognized the "at-

tractive nuisance" doctrine with respect to trespassing children,[3] the same rule should be followed here.

■ The so-called "attractive nuisance" doctrine is, in effect, an exception to the general rule that a possessor of land is not subject to liability caused to trespassers by his failure to exercise ordinary care. Its application is limited to trespassing children under specified conditions.[4] The justification for liability is "the foreseeability of harm to the child, and considerations of common humanity and social policy which, as in other negligence cases, operate to bring about a compromise between conflicting interests, and to curtail to some reasonable extent the defendant's privilege to act as he sees fit without care for the protection of others".[5]

■ There are of course other exceptions to the rule of nonliability to trespassers,[6] and the doctrine of enticement or allurement to animals has been recognized in certain cases, primarily on the ground that the possessor of the property himself was responsible for the trespass.[7] In these exceptions to the general rule of nonliability, the possessor of land is required to exercise reasonable care to warn trespassers of the dangerous condition. This duty is not absolute, but is "a duty merely to give a reasonably adequate warning".[8]

The language in Beinhorn upon which plaintiff relies is ambiguous. It has been interpreted by other courts as holding that the doctrine of allurement and enticement was not applicable to the facts in that case but would be applicable in a similar situation if allurement or enticement were in fact shown.[9] In Beinhorn the poisonous water in the vats was not placed there for animal consumption or intended to be so used. Here the poisonous bait was placed for consumption by coyotes, but it was recognized that it would be attractive to any canines, including dogs, as shown by the warning signs. On the other hand, the cases cited by the court in Beinhorn were typical turntable cases, and the language may be interpreted as holding that the turntable doctrine was not applicable even though the cattle may have been lured and attracted by the poisonous water.

The distinction between Beinhorn and the instant case is admittedly a fine one, but I question whether the Montana court would hold that a landowner in the position of defendant in Beinhorn could place poisoned bait on unfenced land without warning to anyone. It is necessary, accordingly, to consider whether the defendant was negligent and, if so, whether its negligence was the proximate cause of the death of plaintiff's dogs.

The poisoned bait was used as a part of a beneficial predator control program. It was placed in an area enclosed by fences at what was termed a "coyote

---

3. It is true that both this court and the Supreme Court of Montana have recognized the so-called attractive nuisance doctrine with respect to children in many cases. See Johnson v. United States, D.Mont.1958, 163 F.Supp. 388, aff'd 9 Cir., 270 F.2d 488; Callahan v. Buttrey, D.Mont.1960, 186 F.Supp. 715, aff'd 9 Cir., 300 F.2d 899; Nichols v. Consolidated Dairies, 1952, 125 Mont. 460, 239 P. 2d 740, 28 A.L.R.2d 1216; Gilligan v. City of Butte, 1946, 118 Mont. 350, 166 P.2d 797; Martin v. Northern Pac. Ry. Co., 1915, 51 Mont. 31, 149 P.2d 89; Gates v. Northern Pac. Ry. Co., 1908, 37 Mont. 103, 94 P. 751; Sioux City and Pacific Railroad Co. v. Stout, 17 Wall. 657, 21 L.Ed. 745.

4. See Restatement Torts § 339.

5. See Prosser on Torts 2d ed., p. 440, Trespassers § 76.

6. See Restatement Torts §§ 333 to 339, inclusive.

7. See Prosser on Torts 2d ed., p. 439, Trespassers § 76.

8. See Restatement Torts §§ 334, 335 and 336.

9. While some of the cases are factually distinguishable, it appears to me that In Re Williams Estate v. Nevada Wonder Mining Company, 1921, 45 Nev. 25, 196 P. 844, expresses a rule contrary to Beinhorn.

crossing". When the poisoned bait was placed, the ranchers in the area were personally notified and a warning sign was placed at the main entrance to the field where the bait lay.

The area was particularly good for hunting sage grouse, and that season had been closed more than a month when the bait was placed. A bird hunting season was still open, however, and there was substantial evidence of hunting birds in that area. There is no evidence that any of the landowners encouraged trespassing or hunting on their property without permission. On the contrary, at least part of the area was posted, and plaintiff properly sought and obtained permission before hunting upon the Iverson property. There was evidence that it was advisable to place the bait as early as possible to take advantage of the usual coyote migration.

There was evidence that the odor of the poisoned carcass could be detected by dogs 200 to 300 yards away. The bait was placed over 2000 feet from the entrance to the field where a sign was posted and some 174 feet from the fence dividing the Algra and Iverson properties. Both Algras and Iversons were aware of the presence of the bait.[10]

Plaintiff and his dogs had traveled at least three-quarters of a mile in a westerly direction along Flat Willow Creek before reaching the fence between the Algra and Iverson properties. There is a little-used gate in this fence at a point marked "C" on plaintiff's exhibit No. 1. This gate is a short distance north of Flat Willow Creek and southeast of the place where the bait was placed. Plaintiff claims negligence by reason of defendant's failure to post a warning sign at this gate. There is no evidence of any public use of the gate or that plaintiff either used or intended to use the gate. It was used occasionally by Iverson and Algra. Under these circumstances it does not appear to me that defendant could be held negligent for any failure to post a warning sign at this gate.

Moreover, it appears from plaintiff's testimony that when he came to the fence he was "at a point approximately half way between the creek itself and the gravel road * * *" which would be some distance north of the gate.[11] It does not appear from the evidence that any failure to place a sign at this gate was the proximate cause of the death of plaintiff's dogs.

The cases upon which plaintiff relies are factually distinguishable. That is particularly true of Worley v. United

---

10. In fact both had executed written agreements and releases agreeing to hold blameless and indemnify the Fish and Wildlife Service against claims and damages "resulting from the accidental killing of domestic livestock or other animals of value through action of any of the predator control devices" referred to therein; provided that Fish and Wildlife Service "will use every reasonable precaution to preclude the possibility of killing domestic livestock or any form of animal life other than predatory animals".

11. Plaintiff continued:
"There was considerable brush, on a patch of about eight or ten feet wide running along the fence to the south, so I hunted down through that brush with the dogs well in front of me until I came to the end of the brush which was a short distance north of this gate which is marked 'C' on the map.

"Q. Were the dogs fairly close to you, or at that time what was their position?
"A. They were working out maybe forty or fifty yards in front of me.
"Q. That was parallel to this fence line between the Iverson and Algra property?
"A. Yes. Finding no birds in there I turned around and went back through the brush. In the meantime my wife had driven the car up to the fence, between this brush along the fence and an irrigation ditch to the north of us. * * * and when I had cleared the brush and arrived at the car I couldn't see the other two dogs and I turned around and looked in a southwesterly direction toward what is marked on the exhibit as the 1080 bait and I saw both the female and male dogs, Pat and Mike with their heads down and pawing, and it was quite evident they were eating something."

States, D.Or.1952, 119 F.Supp. 719, an action under the Federal Tort Claims Act, in which the plaintiff, a hunter employed by the United States, was injured while he was attempting to drag his dog away from a poison ejecting device called a "coyote getter". Plaintiff's action tripped the device and he received the poison (potassium cyanide, a poison lethal to humans as well as canines) in his face and mouth, resulting in injuries to his eyes and chest.

In addition to the distinction implicit in the foregoing statement, (1) the ejection device was being used in violation of Oregon law; (2) "there were no signs to indicate that the instrument was in the vicinity, although the Government had such signs and one was posted after the incident"; and (3) the bait had not been placed in an enclosure and it was "agreed that plaintiff was a licensee and therefore within the doctrine of the Oregon cases" permitting unrestricted travel over unenclosed areas, even in private ownership.

■ It is of course unfortunate that Mrs. Iverson did not warn plaintiff of the presence of the poisoned bait on the adjoining Algra property. Had plaintiff been aware of the entrance to the Algra buildings and sought permission to hunt from Algras, he would presumably have been warned by Algra of the presence of the bait. Had he entered the gate leading to the field where the bait was stationed he would have observed the warning sign. The death of the two hunting dogs was the result of a chain of unfortunate circumstances, but I must conclude that plaintiff has failed to establish by a preponderance of the evidence that the death of the dogs was proximately caused by any negligent act of the defendant.

The foregoing shall serve as findings of fact and conclusions of law (Rule 52 (a), F.R.Civ.P. 28 U.S.C.A.); and defendant will serve and lodge an appropriate judgment pursuant to Rule 11(b) of the local rules of court.