Merle H. JOHNSON, Administrator of the Estate of Stanley Matt Johnson, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Merle H. JOHNSON, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. Nos. 49, 54.

United States District Court
D. Montana.
Billings Division.

May 1, 1958.

Supplemental Opinion Aug. 11, 1958.

Longan & Jones, Neil S. Keefer, Billings, Mont., F. F. Haynes, Forsyth, Mont., Harry John Mehr, Glendive, Mont., for plaintiff.

Krest Cyr, U. S. Atty., Butte, Mont., Dale F. Galles, Waldo N. Spangelo, Asst. U. S. Attys., Billings, Mont., for defendant.

JAMESON, District Judge.

These cases were consolidated for trial before the court, without a jury. Both arise under the Federal Tort Claims Act, 28 U.S.C.A. § 1346, and seek recovery of damages for the death of Stanley Matt Johnson on July 4, 1955, as the result of electrocution from energy transmitted through the substation operated by the Bureau of Reclamation, United States Department of the Interior, at Forsyth, Montana. Civil No. 49 is prosecuted by the administrator of decedent's estate, under the Montana survival statute (Sec. 93–2824, R.C.M.1947); and Civil No. 54 is an action by decedent's father under the wrongful death statute (Sec. 93–2809, R.C.M.1947).

The Bureau of Reclamation operated what is known as an electrical substation,

consisting of transformers and other equipment to step down the high voltage current for transmission purposes, and used to supply electric power to rural areas. It was an unattended station and located within the limits of the City of Forsyth, in a residential area, in which it was stipulated 23 minor children lived across the streets from the block in which the substation was located. Because of its importance to the determination of this case, the construction of the substation and surrounding fence will be described in some detail. The court has viewed the premises and has had the benefit of numerous photographs received as exhibits and considerable testimony.

The equipment consisted of the usual poles and cross arms, overhead wires and large porcelain insulators, including three high tension transformers located on the ground and, of particular interest here, three oil circuit breaker tanks elevated some three or four feet above the ground by means of a metal platform. The tanks themselves were approximately four feet in height and at the top of each were two bushings and caps through which electrical current was transmitted in the operation of the substation. It was testified the current which passed through each of the bushings was approximately 19,400 volts.

The fence surrounding the equipment on the date of the accident was constructed of steel-pipe posts set in concrete at regular intervals and a framework of pipe connecting these posts at their tops with horizontal bracing pipes about one-half the height of the fence at the corners and adjacent to the gates, covered from the outside with a seven foot woven-wire mesh fence, two-inch by two-inch diamond-shaped design. Above the fence proper three strands of barbed wire were stretched on projections extending approximately one foot above the woven wire fence and pipe frame work. These projections extended above the steel-pipe posts and slanted outward at approximately a forty-five degree angle, except at the four corners of the fence

and at the two double-gates forming a part of the fence. At these points the projections extended vertically above the posts and the three strands of barbed wire, instead of forming an eave-like projection toward the outside, lay one directly above the other in the same plane as the posts and mesh fence.

The two double-gate entrances in the fence (of sufficient width to allow a truck to enter the enclosure) were of the same construction as the fence, consisting of gates of steel pipe framework and woven wire mesh with pipe cross-bars about mid-way. The gates swung either way from steel posts on each side and met in the center with clips which held a center locking bar extending into a socket in the ground and were secured by a padlock. The wire mesh and pipe framework extended to within several inches of the ground when the gates were closed. As before mentioned, the three strands of barbed wire extending the height of the gate to eight feet were vertical and not of the eave-like construction found on the remainder of the fence. "Danger High Voltage" signs were suspended from each gate.

On July 4, 1955, Stanley Matt Johnson, a four and one-half year old child, apparently climbed over the fence at the east gate and thereafter the framework supporting the oil circuit breaker tanks and came in contact with approximately 19,400 volts of electricity, coursing through the bushings at the top of the tanks. He died about four hours later in the hospital.

It is alleged in plaintiff's complaint that the child was attracted by "the color of and humming noises emitted from the dangerous equipment" in the substation, and "discovering and being attracted by the ease with which said gate could be climbed in view of the size of the wire mesh allowing for easy hand and foothold and the lack of an overhanging barrier across the top", climbed over the gate and gained access to the transformers and other electrical equipment within the substation. Plaintiff contends that defendant was negligent in failing to

equip the east gate with the same type of barrier with which the remaining enclosure was equipped and in allowing the east gate to remain so attractive to the decedent that he climbed over it.

The determining factor on the question of liability accordingly is the sufficiency of the fence at the gate as constructed on July 4, 1955, as a safeguard against the entry of young children and particularly the decedent.

■ The Supreme Court of Montana has recognized the attractive nuisance doctrine. Gates v. Northern Pacific Ry. Co., 1908, 37 Mont. 103, 94 P. 751; Martin v. Northern Pacific R. Co., 1915, 51 Mont. 31, 149 P. 89; Gilligan v. City of Butte, 1946, 118 Mont. 350, 166 P.2d 797; Nichols v. Consolidated Dairies of Lake County, 1951, 125 Mont. 460, 239 P.2d 740, 28 A.L.R.2d 1216.

In Gates v. Northern Pacific R. Co., supra, the basis of application of the attractive nuisance doctrine was an analysis of the "turntable case" of Sioux City & Pacific R. R. Co. v. Stout, 1874, 17 Wall. 657, 21 L.Ed. 745, the court quoting at length from the instructions approved by the United States Supreme Court in that case. The court continued: "It is my judgment that when the owner or occupier of grounds brings or artificially creates something thereon especially attractive to children, as shown by the nature of the thing itself and the fact that a child was, or children were, attracted to it, and leaves it so exposed that they are likely to come in contact with it, either as a plaything or an object of curiosity, and where their coming in contact with it or playing about it is obviously dangerous to them, the person so exposing the dangerous thing should reasonably anticipate the injury that is likely to happen to them from its being so exposed, and is bound to use ordinary care to guard it so as to prevent injury to them."

In Nichols v. Consolidated Dairies of Lake County, the court quoted with approval the foregoing excerpt from the Gates case, together with the concurring

opinion outlining the conditions necessary for the application of the doctrine: "(1) That the injured child was too young and inexperienced to appreciate the danger, and was therefore incapable of contributory negligence. (2) That the injury was caused by an unguarded, dangerous machine, or other dangerous thing peculiarly attractive to children of the class to which the injured one belongs. (3) That the landowner impliedly invited children of that class to come upon his premises. This invitation may be implied from the fact that the landowner knew, or, in the exercise of ordinary care, ought to have known, that such children were in the habit of coming on his premises to play or to gratify their childish curiosity." 239 P.2d at page 741.

The court also quoted as a "statement of the facts necessary to satisfy the requirements for application of the attractive nuisance doctrine" Sec. 339, Restatement of the Law of Torts, Vol. II, page 920: "* * * 'A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if (a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and (b) the condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and (d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein'."

It will be noted that in Gates v. Northern Pacific Ry. Co., supra [37 Mont. 103, 94 P. 755], it was held that the owner "is bound to use ordinary care to guard (the property) so as to prevent injury to (young children)". In Gilligan v. City of

Butte, supra [118 Mont. 350, 166 P.2d 808], the court said: "* * * The test is whether the injury to plaintiff or to a class of which the plaintiff was one ought reasonably to have been anticipated. 'It is not necessary, in order to impose this duty, that injury should be inevitable, that the danger thereof should be great, or even that the chances of injury should exceed the chances of absence of injury; but it is sufficient that injury is likely or reasonably probable.' 45 C.J. p. 657. When an instrumentality has a recognizable potentiality for harm to human beings, he who controls that instrumentality must resort to every reasonable measure to eliminate or reduce that potentiality or respond in damages to anyone injured by it, if the injured person is without fault." * * *

These statements are in accord with the general rules well summarized by Corpus Juris Secundum as follows: "The rule of reasonable or ordinary care under the circumstances of the particular case is applicable to the precautions which must be taken to relieve a person from liability under the attractive nuisance doctrine. The fact that young children have no foresight and scarcely any apprehension of danger is a circumstance which those owning instrumentalities potential for harm must bear in mind, for it is every individual's duty to use toward others what due care then and there requires. An owner or occupant of property cannot escape liability under the attractive nuisance doctrine unless he has exercised ordinary care under the facts and circumstances to render the thing constituting the nuisance harmless to children, or to prevent them from going to, or playing around, the object. The owner of premises is not, however, an insurer against injuries to trespassing children produced by the maintenance of an attractive nuisance thereon. A property owner is not required to make his premises 'child proof' by providing all possible safeguards aganst the entry of children, but he fulfills his full duty when he provides such safeguards as would reasonably prevent injury to a child of ordinary and normal instincts, habits, and training; and if he has provided such safeguards he is not liable for injury to a child who had overcome the obstacles and succeeded in reaching a place of danger." 65 C.J.S. Negligence § 29(8) b, p. 446.

The specific duty of electrical companies was considered by the Montana Supreme Court in Bourke v. Butte Electric & Power Co., 1905, 33 Mont. 267, 83 P. 470, 475. While this case did not involve a trespasser or the application of the attractive nuisance doctrine, much of the opinion is pertinent. The court quoted with approval from decisions of other courts and the following from 15 Cyc. 472: " 'The measure or degree of care required of electrical companies is variously defined, but it is conceived that the consensus of opinion is that they must exercise that reasonable care, consistent with the practical operation of their business, which would be observed by reasonably prudent persons under like circumstances, increasing the care with any change in conditions likely to increase the danger, and having due regard to the existing state of science and of the art in question.' "

In Mize v. Rocky Mountain Bell Tel. Co., 1909, 38 Mont. 521, 100 P. 971, plaintiff's intestate was killed while working in a field by coming in contact with a fence wire which had been charged with a dangerous current of electricity by means of a high-tension wire of an electric power company which, in falling upon a telephone wire charged the latter, which in turn transferred the current through a guy wire to a fence wire. The court held that both companies were bound to use reasonable care to prevent the crossing of their respective wires and consequent diversion of the dangerous current. The court quoted from a number of cases arising from crossed wires, including Block v. Milwaukee St. Ry. Co. 89 Wis. 371, 61 N.W. 1101, 27 L.R.A. 365, where the court said in part:

"So far as reasonable knowledge, in the present state of the science and the practical use of electricity as

a motive power for street railways, and reasonable foresight, can go, it (the defendant) is bound to guard the public against the perils attendant upon this use of electricity; but it is liable only for what is known as reasonable care. The present state of the science, and the present practical knowledge of the most practical and effectual means and methods of guarding against such perils as are incident to its use, are a most important element in the question of what is reasonable care". 100 P. at page 975.

It may be inferred from the mere existence of the fence surrounding the substation that defendant fully recognized the dangerous nature of the equipment contained therein, and its inherent attractiveness to small children. Of the equipment proper making up the substation, i. e., the high tension transformers, the oil circuit breaker tanks, and the high voltage lines, the defendant as the possessor of the land on which they were situated would clearly fall within each of the four categories of Section 339 of the Restatement, supra. But this in itself is not sufficient to impose liability upon the defendant under the Restatement rule. The question is whether the condition (including the fence) "was one of which" the defendant knew, or should have known, and realized, or should have realized, "as involving an unreasonable risk of death or serious bodily harm to such children". Recognizing that the equipment constituted an attractive nuisance, did the defendant under all the circumstances take such steps as would be taken by a reasonably prudent person to protect and safeguard young children who might be attracted by the equipment or any portion thereof? Did defendant in its fence provide such protection as would safely guard against any contingency which might reasonably be anticipated?

Defendant argues that there was no evidence that any children previously had climbed or attempted to climb over the fence and that the expert witnesses testified that they had never known of a child climbing over such a fence into an electrical substation in their own or other companies. Plaintiff answers that the fact "that the east gate as constituted on July 4, 1955, could be scaled by a four year old boy is proven by the fact that it was so scaled". The question for determination, however, is whether defendant might reasonably have anticipated that the fence would be so scaled or whether the fence at the gate was such a safeguard as would "reasonably prevent injury to a child of ordinary and normal instincts, habits and training". If so, the fact that decedent overcame the barrier and succeeded in reaching the place of danger would not in itself impose liability upon the defendant.

Plaintiff places strong reliance upon the Arizona case of Holbrook Light & Power Co. v. Gordon, 1944, 61 Ariz. 256, 148 P.2d 360, 363. Yet a careful analysis of that case does not in my opinion support plaintiffs' contentions. There two boys, 9 and 10 years old, had climbed over a 7 foot fence composed of industrial 2 inch mesh wire, the ends of the wire mesh being twisted together at the top to form points extending 3½ to 4 inches above the top railing. Whether these "protruding points of wire" were barriers against persons endeavoring to climb over the fence was held to be a question of fact for the jury, the court saying:

"* * * Appellee and his companion found no trouble in overcoming them. The engineer Sullivan, and those who helped him rescue appellee from the station after the accident, had little or no difficulty in getting over the fence."

The court continued:

"A safe, or at least a safer, way of preventing persons from entering transformer stations would be to encircle the top of the fence with barbed wires so that a person approaching from below would have to overcome such obstruction—a most difficult thing to do. It is in evi-

dence that some electric companies have adopted that method of safety. The expense of such installation would not be much, but much or little the neglect to do it cannot be excused."

Here, of course, there were three strands of barbed wire 4 inches apart, although at the gate they were in a vertical position and for the remainder of the enclosure at an angle.

The Arizona court also distinguished the cases of Hanson v. Washington Water Power Co., 165 Wash. 497, 5 P.2d 1025, and McDonald v. Shreveport Rys. Co., 174 La. 1023, 142 So. 252, as follows:

"An examination of these cases will disclose that in both the transformers were enclosed as follows: In the Shreveport case 'the premises were enclosed with a mesh wire fence, topped with strands of barbed wire to a height of seven feet, and entered through (gates) that (were) kept locked.' In the Hanson case * * * 'along the top of the fence three strands of smooth wire (seprated) six inches apart are strung on arms inclined inward at an angle of about forty-five degrees. The mesh wire is six feet high, and the additional three wires make the height of the fence seven and one-half feet.'

"A comparison of the facts in these two cases with the facts in the present case discloses that they are not authority for the contention that the obstructions in the present case were sufficient. There are no strands of wire on the top of appellants' fence around the transformers. Had there been, the cases cited would have been in point."

In addition, in the Holbrook case, the plaintiff relied upon negligence of the defendant in leaving a ladder in the transformer station available to "children for use in investigating the humming noise from the transformers, without knowledge of the danger of their action." This difference in the facts is not particularly significant. What is significant is the fact that here there were three strands of barbed wire at the top of the fence and the comments of the Arizona court regarding the failure of the defendant in the Holbrook case to have such wires at the top of the fence.

■■ The court received in evidence, over plaintiffs' objection, the expert testimony of three electrical engineers with respect to the custom and practice of other electrical companies in the construction of fences surrounding similar substations. It is true, as contended by plaintiffs, that an industry-wide norm in fencing design is not controlling. Evidence of the custom of other companies in fencing comparable substations, however, is competent for consideration by the court in determining whether the defendant exercised due care. Customary practice is not ordinary care; it is but evidence of ordinary care. Northwest Airlines v. Glenn L. Martin Company, 6 Cir., 1955, 224 F.2d 120, 50 A.L.R.2d 882, certiorari denied 350 U.S. 937, 76 S.Ct. 308, 100 L.Ed. 818. Customary practice would not excuse the defendant unless it was consistent with due care. Anstead v. Pacific Gas & Electric Co., 1928, 203 Cal. 634, 265 P. 487.[1] "It is true that the question of the exercise of due care is not to be determined solely with reference to the custom of other companies, but evidence as to such custom is certainly competent for consideration * * upon that question". Dunagan v. Appalachian Power Co., 4 Cir., 1929, 33 F. 2d 876, 879, 68 A.L.R. 1393, certiorari denied 280 U.S. 606, 50 S.Ct. 152, 74 L.Ed. 649.

One of the witnesses called by the defendant had been employed by the Bureau of Reclamation in the Power Division of the Regional Office at Billings, Montana since 1933. The others were electrical

1. See also Murphy v. Central Kansas Electric Cooperative Ass'n, 1955, 178 Kan. 210, 284 P.2d 591; 18 Am.Jur. 446–7, Electricity, Secs. 50, 51; Bourke v. Butte Electric & Power Co., supra.

engineers employed by Montana Power Company and Montana-Dakota Utilities Company, the major private companies operating in Montana. A. P. McDonald, employed by Montana-Dakota since 1934, testified that he was familiar with the practice of Montana-Dakota in 1955 in Montana, Wyoming, North Dakota and South Dakota, in fencing similar property. He testified that he had examined the substation of defendant and that, in his opinion, the fence and the gate at the time of the accident conformed to and were equal to the standards of Montana-Dakota and were equal to the standards being used by the electrical industry in new construction in 1955.

Ray M. Ball, employed by Montana Power Company for almost thirty years and at present its chief engineer, testified that for several years he was in charge of design of substations, including fences, for Montana Power Company; that the substation in question was "practically equivalent" to those used by Montana Power, explaining that some of his company's substation fences had vertical posts at the corners with 45° angle wires and vertical at the gates; that he had observed fences used by Bonneville Power Authority, R.E.A., Idaho Power, Utah Power, Washington Water Power and some "on the Coast", and that the fences used by those companies were very similar to that used by defendant at the time of the accident,— "6, 7 or 8 foot wire mesh with barbed wire over the top".

Evidence was admitted, over defendant's objection, that subsequent to the accident a change was made in the strands of the barbed wire at the corners of the fence so that they slanted outward at a 45° angle in the same manner as the rest of the fence. At the two gates additional sections of pipe with barbed wire attached were added to the vertical ex-tensions at a 90° angle, resulting in an inverted L-type projection hanging outward over the top of the gates. These additions were made at slight cost and with little inconvenience to the defendant. With the overhanging projections installed on the gates, they could be opened outward as easily as before, but if they were opened inward, it would require opening one gate out first and then inward, one at a time.

Evidence of taking additional precautions after the accident is not admissible to prove negligence at the time of the accident, " * * * because the taking of such precautions against the future is not to be construed as an admission of responsibility for the past, has no legitimate tendency to prove that the defendant had been negligent before the accident happened * * *". Columbia and Puget Sound Co. v. Hawthorne, 1892, 144 U.S. 202, 12 S.Ct. 591, 593, 36 L.Ed. 405.[2] This rule was recognized by the Supreme Court of Montana in Pullen v. City of Butte, 1912, 45 Mont. 46, 121 P. 878 and Titus v. Anaconda Copper Min. Co., 1913, 47 Mont. 583, 133 P. 677, although in both cases it was held that evidence of subsequent repairs may be admitted for the purpose of showing the condition of the premises at the time of the accident.

Evidence of subsequent repairs, changes, or precautions may also be admitted to show the practicability of making them before the accident.[3] I have concluded accordingly that evidence of the changes in the fence at the top of the gate made subsequent to the accident was properly admitted, for the sole purpose of showing the practicability of this additional safeguard, but not as evidence of negligence on the part of the defendant.

In the light of all the evidence, including the photographs admitted as

2. See also Henwood v. Chaney, 1946, 8 Cir., 156 F.2d 392, certiorari denied 329 U.S. 700, 67 S.Ct. 113, 91 L.Ed. 655; Northwest Airlines v. Glenn L. Martin Company, supra; 65 C.J.S. Negligence § 225, p. 1042.

3. 65 C.J.S. Negligence § 225(e), p. 1044; Hatcher v. Globe Union Mfg. Co., 1934, 178 Wash. 411, 35 P.2d 32; Cincinnati H. & D. R. R. Co. v. Van Horne, 6 Cir., 1895, 69 F. 139; Franklin v. Webber, 1919, 93 Or. 151, 182 P. 819.

exhibits, and after viewing the premises, I cannot escape the conclusion that prior to the accident there was no reason for defendant to anticipate that a young child might climb the fence at the gate in question. In my opinion the defendant had exercised due care under the circumstances, and had taken reasonable precautions to provide such safeguards as would reasonably prevent injury to a child of "ordinary and normal instincts, habits and training". The fact that the Johnson child did overcome the obstacles and reach a place of danger is not sufficient in itself to impose liability on the defendant. It is my conclusion that the plaintiffs have failed to establish that decedent's injuries and death were proximately caused by any act of negligence of the defendant.

Pursuant to Rules 11(b) and 11(d) of the Rules of Procedure of this court, defendant shall, within ten days, prepare and file drafts of findings of fact and conclusions of law and judgment in each case and serve a copy upon the plaintiff. The plaintiff in each case shall then have ten days within which to serve and file objections thereto.

### Supplemental Opinion.

Prior to entry of judgment, plaintiff in each case filed a motion to reopen the trial for the purpose of hearing additional testimony "that in other cities and towns in Montana, certain electric substations owned and operated by the private utilities, which are located in residential districts, are equipped with 45 degree angled protective projections upon the gates as well as upon the fences surrounding them." It is recited in the motion that, "The purpose for introduction of this additional testimony is to show that the electrical industry recognizes that the industry standard of care requires that installation of 45 degree angled projections upon all parts of the fences, including gates, around substations located in residential areas inhabited by small children, be made." The motion is supported by affidavits of plaintiff's counsel that he "has traveled extensively about the state and ascertained that several substations, or stations where high voltage is enclosed, have strands of barbed wire sloped out over the tops of the gates, as well as strands of barbed wire sloped out over the balance of the enclosure."

The motion and affidavit do not set forth the location of the substations in question, describe the gates as to size and type, or give the names of the witnesses who will present the additional testimony; nor do they explain why this evidence was not discovered in advance of trial. Assuming, however, that plaintiff would present competent testimony that at certain substations within the State of Montana, there are gates of the size and type here involved where the strands of barbed wire at the top are at a 45 degree angle, instead of vertical, would that testimony change the result?

The affidavit recites that none of the substations in question are operated by the Bureau of Reclamation, so presumably they are substations of either Montana Power Company or Montana-Dakota Utilities Company. I have reviewed the testimony of Ray M. Ball, Chief Engineer of Montana Power Company, and A. T. McDonald, retired Chief Electrical Engineer of Montana-Dakota.

McDonald, prior to his retirement in 1954, had been in charge of the construction of substations for Montana-Dakota, including its substation at Forsyth, Montana. He was in charge of "close to 250" substations. The substations of Montana-Dakota had three barbed wires vertical over the top of the gates. Sometimes the wires extended over the gates and sometimes they ran "right through over the gate", letting the "gate swing underneath." McDonald had observed the defendant's substation at Forsyth and testified that "it conformed with and was equal to the standards of fences" of Montana-Dakota, exceeded the average of the industry, and was equal to the standards being used by the industry in new construction in 1955. He testified

on cross-examination that this type of construction was used in residential areas. He testified further that, "It is more recent that they have come to the 45 degree angle slant, and recently there may be some of them that have it all the same way", but he could not say that he had seen any.

Ball testified that some of Montana Power's substations "have vertical posts at the corner with 45 degree angle wire and vertical posts at the gates", and that "others have a 45 degree angle bracket in the posts." On cross-examination, he testified that it made no difference whether the substation was "in a residential district or 4 or 5 miles out in the country"; that his company had few attended stations and had a standardized fence. He testified further that his company had stations where the barbed wire was sloped out, and mentioned in particular one at Clyde Park, Montana. With reference to the slanted wires, Ball testified that "some of them have the post brought up and bent out" and "others have a fitting that extends out"; that his company has both kinds; that they put out minimum specifications, purchase on low bid, and for that reason their fences are not built all the same.

It appears accordingly that Montana Power Company has gates of both types, i. e., some where the strands of barbed wire at the top are vertical and some where they slant at a 45 degree angle. As far as disclosed by the evidence, prior to the accident involved in this action, the gates of the substations of the Bureau of Reclamation and Montana-Dakota all had strands of barbed wire in a vertical plane. Presumably the additional evidence contemplated in plaintiff's motion would show that some of Montana Power's gates have slanted wires at the top. This already appears from Ball's testimony.

It further appears, however, that at other Montana Power substations, the gates have vertical strands of barbed wire at the top, that no differentiation is made in this respect between attended and unattended stations or between residential and non-residential areas. I cannot escape the conclusion that the fence and gate of defendant's substation conformed to the custom and practice of private electrical companies in the area and that the defendant had exercised due care.

To reopen the case would entail additional expense for both parties without, in my opinion, changing the result. Plaintiff's motion is denied.