[L.A. No. 30115. In Bank. Dec. 12, 1974.]

DARRELL FRANCIS AULT, Plaintiff and Respondent, v.
INTERNATIONAL HARVESTER COMPANY,
Defendant and Appellant.

## COUNSEL

Wise, Kilpatrick & Clayton, George E. Wise and William D. Easton for Defendant and Appellant.

Harney, Charbonneau & Bambic, Harney, Ford, Charbonneau & Bambic and David M. Harney for Plaintiff and Respondent.

Joseph W. Cotchett, Cotchett & Hutchinson, Robert E. Cartwright, William H. Lally, Stephen I. Zetterberg, Edward I. Pollock, Sanford M. Gage and Leonard Sacks as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**MOSK, J.**—Plaintiff was injured in an accident involving a motor vehicle known as a "Scout," manufactured by defendant. He brought an action alleging that the accident was caused by a defect in the design of the vehicle, asserting that he was entitled to recovery under theories of strict liability, breach of warranty, and negligence.

The gear box of the Scout involved in the accident was manufactured of aluminum 380, a material which plaintiff asserts was defective for that purpose. At the trial evidence established that after the accident defendant changed from aluminum 380 to malleable iron in the production of the gear box. A jury returned a verdict of $700,000 in plaintiff's favor. On this appeal from the ensuing judgment, defendant maintains that the trial court erred in several rulings regarding the admission and exclusion of evidence. It places primary reliance upon the admission into evidence of the change to malleable iron in the manufacture of the gear box, contending that the receipt of this evidence violates the prohibition contained in sec-

tion 1151 of the Evidence Code.[1] We conclude that the evidence was properly admitted because the provisions of section 1151 do not apply in an action in which the defendant is alleged to be liable under the theory of strict liability.

On the morning of November 8, 1964, plaintiff was riding as a passenger in the Scout on Nine Mile Canyon Road near Mojave, California, when the vehicle plunged 500 feet to the bottom of the canyon, injuring him seriously. The road was 20 feet wide and dry. Just prior to the accident, the Scout was traveling at a speed of only 10 to 15 miles an hour. The owner and driver of the vehicle had traversed Nine Mile Canyon Road on two prior occasions in the Scout without difficulty. Both the driver and plaintiff developed retrograde amnesia and were unable to testify as to the circumstances of the accident.

After the accident, it was discovered that the gear box on the Scout had broken. Plaintiff contended that the break occurred while the Scout was traveling on the highway, causing the vehicle to go out of control, whereas defendant asserted that the gear box broke on impact as the vehicle hurtled down into the canyon and that the accident was caused either by driver negligence or the collapse of the roadway.

It was plaintiff's contention that the gear box broke because the aluminum 380 out of which it was made suffered from metal fatigue, and he produced a number of expert witnesses in support of this theory. Plaintiff's witnesses also testified that aluminum 380 was an unsuitable material out of which to build the gear box, that malleable iron was stronger than aluminum 380, that a gear box made of malleable iron would have been less likely to fail, and that in 1967, three years after the accident, defendant substituted malleable iron for aluminum 380 in the manufacture of the Scout's gear box.

Defendant asserts that the admission of the evidence it changed from aluminum 380 to malleable iron after the accident violated the proscription of section 1151. In our view, however, the language and the legislative history of section 1151 demonstrate that the section is designed for cases involving negligence or culpable conduct on the part of the defendant, rather than to those circumstances in which a manufacturer is alleged to be strictly liable for placing a defective product on the market.

[1]Section 1151 provides, "When, after the occurrence of an event, remedial or precautionary measures are taken, which, if taken previously would have tended to make the event less likely to occur, evidence of such subsequent measures is inadmissible to prove negligence or culpable conduct in connection with the event." All statutory references will be to the Evidence Code, unless otherwise noted.

Furthermore, we are not persuaded that the rationale which impelled the Legislature to adopt the rule set forth in the section for cases involving negligence is applicable to suits founded upon strict liability, and we therefore decline to judicially extend the application of the section to litigation founded upon that theory.

Section 1151 by its own terms excludes evidence of subsequent remedial or precautionary measures only when such evidence is offered to prove negligence or culpable conduct. In an action based upon strict liability against a manufacturer, negligence or culpability is not a necessary ingredient. The plaintiff may recover if he establishes that the product was defective, and he need not show that the defendants breached a duty of due care. (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62-63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].)[2]

Defendant maintains that the phrase "culpable conduct" in section 1151 is sufficiently broad to encompass strict liability. It concedes that the term "culpable" implies blameworthiness, and that a manufacturer in a strict liability action may not be blameworthy in a legal sense. However, asserts defendant, a manufacturer who has placed a defective product on the market is blameworthy in a moral sense, and is therefore guilty of "culpable conduct" within the meaning of section 1151. We are unpersuaded by this tenuous construction. It is difficult to escape a contrary conclusion: if the Legislature had intended to encompass cases involving strict liability within the ambit of section 1151, it would have used an expression less related to and consistent with affirmative fault than "culpable conduct"— a term which, under defendant's theory, would embrace a moral rather than a legal duty.[3]

The history and purpose of section 1151 compel our conclusion that it was not intended to apply to cases found on the theory of strict liability in a products liability action. According to its draftsmen, section 1151 was intended merely to codify "well-settled law." (Law Revision Com.

---

[2]The clear theoretical distinction between these two bases of recovery impelled this court in a recent decision to hold that contrary to the Restatement (Rest.2d Torts, § 402a), a plaintiff is not required, in order to prevail on the theory of strict liability, to show that a product is unreasonably dangerous to the user, and that it is sufficient if he demonstrates that it contained a defect which caused him injury. (*Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 135 [104 Cal.Rptr. 433, 501 P.2d 1153].)

[3]Another argument of defendant is that unless "culpable conduct" is interpreted to include strict liability, the phrase has no meaning in section 1151 because it would then be synonymous with "negligence." However, there are types of faulty conduct other than negligence which are encompassed within "culpable conduct," such as wanton and reckless misconduct. (*Donnelly* v. *Southern Pacific Co.* (1941) 18 Cal.2d 863, 869 [118 P.2d 465]; Rest.2d Torts, § 500.)

comment to Evid. Code, § 1151.) The rule excluding evidence of subsequent repairs originally rested on the notion that such repairs were completely *irrelevant* to the issue of defendant's *negligence* at the time of the accident. Thus, the first case to adopt this rule in California, *Sappenfield* v. *Main-St. etc. R.R. Co.* (1891) 91 Cal. 48, 62 [27 P. 590], stressed that "The negligence of the employer which renders him responsible for the accident depends upon what he did and knew before the accident, and must be established by facts and circumstances which preceded it, and not by acts done by him after the occurrence." (See, e.g., *Helling* v. *Schindler* (1904) 145 Cal. 303, 312-315 [78 P. 710].)

On the other hand a number of more recent cases have recognized several exceptions to the rule of exclusion in negligence cases. For example, several decisions acknowledge that evidence of subsequent repairs is relevant to the issue of negligence, for if the changes occur closely in time they may well illustrate the feasibility of the improvement at the time of the accident, one of the normal elements in the negligence calculus. (See e.g., *Johnson* v. *United States* (D.Mont. 1958) 163 F.Supp. 388, 395; *Baldwin Contracting Co.* v. *Winston Steel Works, Inc.* (1965) 236 Cal. App.2d 565, 573 [46 Cal.Rptr. 421]; *Varas* v. *Barco Mfg. Co.* (1962) 205 Cal.App.2d 246, 259 [22 Cal.Rptr. 737].)

Nevertheless, courts and legislatures have frequently retained the exclusionary rule in negligence cases as a matter of "public policy," reasoning that the exclusion of such evidence may be necessary to avoid deterring individuals from making improvements or repairs after an accident has occurred. Section 1151 rests explicitly on this "public policy" rationale. In explaining the purpose of the section, the draftsmen's comment states: "The admission of evidence of subsequent repairs *to prove negligence* would substantially discourage persons from making repairs after the occurrence of an accident." (Italics added.) (Law Revision Com. comment to Evid. Code, § 1151.)

While the provisions of section 1151 may fulfill this anti-deterrent function in the typical negligence action, the provision plays no comparable role in the products liability field. Historically, the common law rule codified in section 1151 was developed with reference to the usual negligence action, in which a pedestrain fell into a hole in a sidewalk (see, e.g., *City of Miami Beach* v. *Wolfe* (Fla. 1955) 83 So.2d 774) or a plaintiff was injured on unstable stairs (see, e.g., *Hadges* v. *New York Rapid Transit Corporation* (1940) 259 App. Div. 154 [18 N.Y.S.2d 304]); in such circumstances, it may be realistic to assume that a landowner or potential

defendant might be deterred from making repairs if such repairs could be used against him in determining liability for the initial accident.

When the context is transformed from a typical negligence setting to the modern products liability field, however, the "public policy" assumptions justifying this evidentiary rule are no longer valid. The contemporary corporate mass producer of goods, the normal products liability defendant, manufactures tens of thousands of units of goods; it is manifestly unrealistic to suggest that such a producer will forego making improvements in its product, and risk innumerable additional lawsuits and the attendant adverse effect upon its public image, simply because evidence of adoption of such improvement may be admitted in an action founded on strict liability for recovery on an injury that preceded the improvement. In the products liability area, the exclusionary rule of section 1151 does not affect the primary conduct of the mass producer of goods, but serves merely as a shield against potential liability. In short, the purpose of section 1151 is not applicable to a strict liability case and hence its exclusionary rule should not be gratuitously extended to that field.

This view has been advanced by others. It has been pointed out that not only is the policy of encouraging repairs and improvements of doubtful validity in an action for strict liability since it is in the economic self interest of a manufacturer to improve and repair defective products, but that the application of the rule would be contrary to the public policy of encouraging the distributor of mass-produced goods to market safer products. (Note, *Products Liability and Evidence of Subsequent Repairs,* 1972 Duke L.J. 837, 845-852.)[4]

---

[4]In a cogent analysis of the policy considerations underlying the admission of evidence of post-occurrence changes in a products liability context, the author states, "The assumption that the admission of evidence of subsequent repairs discourages defendants from making required repairs may be erroneous. Manufacturers and distributors of mass-produced products may not be so callous to the safety of the consumer as the general exclusionary rule presumes. Furthermore, to the extent that admission of such evidence results in recovery by injured plaintiffs, it can be argued that evidence of subsequent repairs *encourages* future remedial action. A distributor of mass-produced goods may have thousands of goods on the market. If his products are defective, the distributor would probably face greater total liability by allowing such defective products to remain on the market or by continuing to put more defective products on the market than he would by being adjudged liable in one particular case where evidence of subsequent repairs was introduced. Also, concern on the part of the distributors for consumer protection is promoted by consumer organizations, federal agencies, and mass media exposure of product defects. To some extent, the economic self-interest of product distributors requires that they repair and improve defective products to avoid adverse publicity which might result from future litigation. Since a prior jury finding of product defectiveness is admissible in a subsequent suit when the product causing the second injury is substantially similar to the first, distributors of defective products are under pressure to repair or

The recent case of *Sutkowski* v. *Universal Marion Corporation* (1972) 5 Ill.App.3d 313 [281 N.E.2d 749], directly supports this conclusion. Noting that in the products liability field "policy considerations are involved which shift the emphasis from the *defendant manufacturer's conduct to the character of the products*" (italics added) (281 N.E.2d at p. 753), the *Sutkowski* court held that the Illinois statutory rule excluding evidence of post-occurrence changes in negligence cases did not apply to products liability cases.

Given the purpose of section 1151, and the difference between negligence and products liability actions noted above, it is not surprising that in drafting the provision the Legislature confined the section to actions in which the defendant's "negligence" or "culpable conduct" is at issue. Neither the Legislature nor the Law Revision Commission which drafted the section could have been oblivious to the likely evidentiary use of subsequent design changes in strict liability cases. Thus, the limitation of the section to essentially negligence causes of action must be deemed deliberate and significant.[5]

Defendant assigns numerous other evidentiary rulings of the trial court as error. ■ It complains that the trial court allowed expert witnesses to testify regarding an accident occurring prior to the present one, as well as one occurring subsequently, in which gear boxes made of aluminum 380 in Scout vehicles had allegedly failed. It is asserted that the court erred in admitting this testimony because plaintiff did not show that there was a substantial similarity between the other two accidents and the circumstances of the present case, and that defendant was in effect required to try three separate lawsuits and to prove that in each of these prior cases, as well as in the present case, the gear box broke on impact.

■ Evidence of other accidents is admissible to prove a defective condition, knowledge, or the cause of an accident, provided that the cir-

---

alter their products to insulate themselves from a finding of defectiveness which may be used against them in subsequent litigation.

"In conclusion, excluding evidence of subsequent repairs to encourage future remedial action may preclude recovery under theories of products liability which are themselves designed to ensure safety in marketed products. Relevant evidence should not be excluded from a products liability case by an obsolete evidentiary rule when modern legal theories, accompanied by economic and political pressures, will achieve the desired policy goals." (*Id.,* at pp. 848-850.) (Fns. omitted.)

[5]Our conclusion that the evidence of the change to malleable iron in the manufacture of the gear boxes does not violate section 1151 also answers defendant's assertion that the court erred in admitting evidence that defendant had replaced the aluminum brake pedal on its fire engines with malleable iron. Furthermore, defendant did not object to the admission of evidence of that change.

cumstances of the other accidents are similar and not too remote. (*Kopfinger* v. *Grand Central Pub. Market* (1964) 60 Cal.2d 852, 861 [37 Cal.Rptr. 65, 389 P.2d 529].) ██ Here, the expert witnesses had been retained in other litigation to analyze the properties of the gear boxes involved in the other accidents, and had reached the conclusion that they had failed because of metal fatigue. In the trial of the present case, they described the tests they performed, and testified that in their opinion the physical properties of all three gear boxes were similar and that the failure in the present case was also due to metal fatigue. The expert who testified regarding the first accident compared the damaged gear box involved in that accident with the box in the present case, and stated that a blow to the gear box would not have caused the failure in either accident. The other witness' testimony consisted largely of an account of the scientific tests he had performed on aluminum 380 to determine its properties, and the conclusions he had reached from those tests.

Thus, although the purpose of the testimony was to indicate that all three accidents occurred because of the failure of the gear box, the focus was not on the accidents themselves but upon the inherent similarity in the physical and mechanical properties of the three gear boxes, all of which purportedly contained similar defects. Since there was no dispute that all three instruments were manufactured out of aluminum 380, we cannot conclude that the evidence was erroneously admitted.

██ Defendant asserts that the trial court also erred in refusing to allow it to introduce evidence that in a prior trial between the parties (in which the jurors were unable to agree on a verdict), plaintiff had alleged in his complaint that the accident was proximately caused by the intoxication of the driver of the vehicle. The action against the driver was dismissed prior to the trial of the previous action. Defendant urges that a superseded pleading is admissible both for purposes of impeachment and as substantive evidence of a prior inconsistent statement under sections 770 and 1235. However, the complaint in which the allegation was made had not been verified by plaintiff, there was no showing that he had seen the pleading or furnished the information on which it was based (*Zanotto* v. *Marogna* (1954) 124 Cal.App.2d 329, 331 [268 P.2d 826]), and defendant refers to no testimony at the present trial by plaintiff with which the allegation in the superseded complaint is inconsistent. Under these circumstances, the trial court correctly refused to admit examination of plaintiff on the basis of the prior pleading.

██ During the course of the trial plaintiff read into evidence the testimony of an expert witness from the first trial of this action. In the course

of that reading the witness was asked if he had heard the testimony of another witness named Beckett that an inspection of 20 or 25 Scout vehicles had revealed that 60 percent suffered either pitting of the worm gear or cracks in the box. The expert witness replied that he had, and that his own testimony was consistent with Beckett's finding. Defendant's attorney in the instant case objected to any reference to the Beckett opinion on the ground of hearsay. The trial court overruled the objection on the premise that Beckett would testify in the present case and give essentially the same testimony he had offered at the prior trial. If such testimony was not forthcoming, stated the court, the evidence would be stricken on motion. Thereafter, when Beckett testified, he did not relate the opinion attributed to him in the prior trial. Defendant did not make a motion to strike Beckett's opinion, but moved for a mistrial after plaintiff rested his case on the ground of plaintiff's failure to cure admission into evidence of Beckett's hearsay opinion.

When evidence is adduced upon the theory that it will be properly connected, subject to a motion to strike, and that motion is not subsequently urged, a party is deemed to have waived the objection thereto. (*People* v. *Benenato* (1946) 77 Cal.App.2d 350, 360-361 [175 P.2d 296], disapproved on other grounds in *In re Wright* (1967) 65 Cal.2d 650, 654-655 [56 Cal.Rptr. 110, 422 P.2d 998].) Defendant asserts that it deliberately failed to make the motion because the evidence of Beckett's opinion was too prejudicial to be corrected by a motion to strike and an admonition to the jury would have served only to recall the testimony to the jury's mind.

We do not find this contention to be meritorious. It is evident from the transcript that the trial court had overlooked plaintiff's earlier promise to lay a foundation for the Beckett prior opinion, which was admitted into evidence several days before Beckett testified in the instant case. A motion to strike would have served the purpose of reminding plaintiff of his failure to elicit direct testimony concerning the opinion expressed in the prior trial so that plaintiff would have been afforded the opportunity to supply the necessary foundational testimony. Instead, defendant delayed until plaintiff had rested his case, and then belatedly moved for mistrial. Moreover, the Beckett opinion was not so prejudicial in the context of this trial that an admonition to the jury would have been without effect. It consisted of a single statement by one witness for plaintiff, among a total of eight experts who testified that the gear box was defective. Thus, even if plaintiff had been unable to supply a proper foundation, an appropriate admonition to the jury would have cured the error.

Defendant urges several other errors in the admission and exclusion of evidence, but we need not discuss these arguments in detail since, even if its contentions are meritorious, no prejudice resulted from the alleged errors.

The judgment is affirmed.

Wright, C. J., McComb, J., Tobriner, J., Sullivan, J., and Burke, J.,* concurred.

I

**CLARK, J.**—I dissent.

Section 1151 of the Evidence Code excludes evidence of subsequent remedial modifications when offered to prove "culpable conduct." Culpable conduct includes conduct breaching a legal duty. Because a plaintiff seeking recovery on a product liability theory must prove the defendant breached his legal duty not to place a defective product in the stream of commerce, section 1151 is applicable to the case before us.

"Culpable" is defined as: "[b]lamable; censurable; involving the breach of a legal duty or the commission of a fault. The term is not necessarily equivalent to 'criminal,' for in present use, and notwithstanding its derivation, it implies that the act or conduct spoken of is reprehensible or wrong but not that it involves malice or a guilty purpose. 'Culpable' in fact connotes fault rather than guilt." (Black's Law Dict. (4th rev. ed. 1958) p. 454.) From the above definition it is clear "culpable" includes conduct breaching a legal duty. Concededly, "culpable" connotes moral blameworthiness or moral fault; however, the definition is not restricted to the latter concept, and clearly includes *legal* blameworthiness and *legal* fault.

A manufacturer placing a product in the stream of commerce has a legal duty to prevent defects causing injury. (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) And before a plaintiff may recover on a theory of product liability, he must prove the defendant breached this duty. Thus, by definition, the plaintiff must prove the defendant's conduct "culpable," and in proving such culpability, section 1151 clearly prohibits using evidence of subsequent remedial measures.

The important policy underlying prohibiting evidence of subsequent change is as applicable to product liability actions as to negligence actions.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

The basis for the exclusion in negligence cases is that the jury may unjustifiably view the change as an admission of fault. Following an injury, modifications will frequently be made which would have rendered the injury less likely. While these modifications might be the result of some feeling of responsibility, it is at least as probable the change was made because it was the socially desirable or humane thing to do. Such conduct is not probative of an admission that the modification was the required standard of conduct prior to the injury. It may have been thought to be the standard required only after the injury is known. Or, the defendant may have desired to rise above the required standard. (See, Proposed Fed. Rules of Evid., § 407, Practice Comment, p. 104.) Finally, the change may not be a safety measure at all but rather a change made for functional, aesthetic or economic reasons.

Acknowledging the lack of probative value, this court many years ago held that an admission of negligence may not be founded on evidence of change following an accident and that when such evidence is relevant only to prove admission it must be excluded. (*Helling* v. *Schindler* (1904) 145 Cal. 303, 312 [78 P. 710]; *Sappenfield* v. *Main-St. etc. R.R. Co.* (1891) 91 Cal. 48, 62 [27 P. 590].) Lack of probative value is the basis for the exclusionary rule according to Professor Wigmore, although he recognizes that some courts have also relied on public policy to avoid discouraging persons from making repairs following an accident. (2 Wigmore on Evidence (3d ed. 1940) pp. 151-159.)[1]

There is even less probative value when evidence of subsequent change is offered to prove an admission in product liability cases. Change in a

[1]The policy of encouraging modification following an accident may not be viewed as the basis of the section 1151 exclusionary rule when the rule is considered in light of present California law. Section 1151 by its terms only excludes evidence when offered to prove negligence or culpability; the section does not necessarily exclude evidence when it is probative to other relevant issues. (*Morehouse* v. *Taubman Co.* (1970) 5 Cal.App.3d 548, 555 [85 Cal.Rptr. 308]; *Sanchez* v. *Bagues & Sons Mortuaries* (1969) 271 Cal.App.2d 188, 190-191 [76 Cal.Rptr. 372]; *Baldwin Contracting Co.* v. *Winston Steel Works, Inc.* (1965) 236 Cal.App.2d 565, 573 [46 Cal.Rptr. 421].) A party contemplating change in his real property, chattel, or product prior to trial cannot know with certainty that evidence of his change will not be received as relevant on issues other than negligence and culpability, frustrating the policy of encouraging safety modification. Because lack of admissibility is not predictable under the California rules but may only be determined on the basis of issues developed at trial, the goal of encouraging modifications is not substantially furthered by section 1151.

The majority argue it is unlikely that potential admission of evidence of change will deter manufacturers from making changes toward increased safety. But, because encouraging change is not the purpose of section 1151, the reasoning does not furnish a basis to reject application of the section to product liability cases.

product is frequently made for reasons unrelated to the remedial nature of the change. Among the motivations for change are the desires to decrease production cost or to increase efficiency or salability. The most striking illustration of lack of probative value is supplied by the automobile industry. Each year hundreds of changes are made in a new model. It is absurd to suggest that each change reflects an admission the modification was made to remedy a defect.

Notwithstanding the lack of probative value, juries, in the heat of negligence or product liability trials—learning only of a single change—may conclude the change reflects an admission of negligence or defect and may give great and decisive weight to the perceived admission. The danger of such misuse of evidence is at least as great in product liability cases as in negligence cases.

The lack of probative value and the danger of misuse of evidence of subsequent change are not cured when the issue before the jury is defect rather than negligence, and no reason exists for refusing to give the word "culpable" its common meaning. Accordingly, I conclude that section 1151 should be applicable in product liability cases.

## II

The remaining issue is the application of section 1151 to the evidence that International Harvester changed from aluminum 380 to malleable iron. Section 1151 excludes evidence only when used to prove negligence or culpable conduct. Case law allows evidence of subsequent change to prove issues other than negligence or culpable conduct. For example, evidence of subsequent precautions may properly be admitted when it tends to impeach the testimony of a witness. (*Daggett* v. *Atchison, T. & S. F. Ry. Co.* (1957) 48 Cal.2d 655, 661 [313 P.2d 557]; *Hatfield* v. *Levy Brothers* (1941) 18 Cal.2d 798, 809-810 [117 P.2d 841]; *Inyo Chemical Co.* v. *City of Los Angeles* (1936) 5 Cal.2d 525, 543-544 [55 P.2d 850].)

Despite relevance to a proper purpose, the danger of a jury improperly viewing the evidence as an admission of legal fault is apparent, and the danger of misuse may well outweigh probative value of the evidence. Not only is such misuse contrary to the express prohibition created by the Legislature, but also the misuse is manifestly unfair to defendant. To alleviate the potential unfairness and to implement the legislative prohibition, the trial court must carefully balance the need for the evidence against the dangers of its use.

Consequently, before evidence of subsequent change is received as rele-

vant to a proper issue, the party introducing the evidence must persuasively satisfy the trial court[2] that the "issue on which it is offered is of substantial importance and is actually, and not merely formally in dispute, that the plaintiff cannot establish the fact to be inferred conveniently by other proof, and consequently that the need for the evidence outweighs the danger of its misuse." (McCormick, Evidence (2d ed. 1972) pp. 668-669; see also, Evid. Code, § 352; *Sanchez* v. *Bagues & Sons Mortuaries* (1969) 271 Cal.App.2d 188, 191 [76 Cal.Rptr. 372]; Jefferson, Cal. Evidence Benchbook (1972) § 21.1; cf. Proposed Fed. Rules of Evid., § 407 and the Practice Comment.)

To improperly admit such evidence to prove issues not actually disputed or easily provable by other evidence judicially repeals the statute. (*Sanchez* v. *Bagues & Sons Mortuaries, supra,* 271 Cal.App.2d 188, 191-193; *Pierce* v. *J. C. Penney Co.* (1959) 167 Cal.App.2d 3, 11 [334 P.2d 117].)

When this three-part test is not applied to evidence of subsequent modification, and the admission of such evidence results in a miscarriage of justice, the case should be reversed. (*Hrnjak* v. *Graymar, Inc.* (1971) 4 Cal.3d 725, 734 [94 Cal.Rptr. 623, 484 P.2d 599, 47 A.L.R.3d 224]; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; Cal. Const., art. VI, § 13.)

In this case the record not only indicates that the above three-part test was not considered by the court before admitting evidence of subsequent modification, but also that plaintiff apparently introduced such evidence on the issue of feasibility of malleable iron to avoid application of section 1151. The primary dispute in this case was whether the aluminum steering gear box caused the injury. Feasibility was not a contested issue and, even if contested, could have been proven by evidence other than International Harvester's subsequent replacement of the aluminum steering gear box.[3] Accordingly, the evidence should have been excluded.

The record reveals improper introduction of the subsequent modification was highly prejudicial to defendant. The evidence on the critical issue

[2]The burden of proof established in *Hrnjak* v. *Graymar, Inc.* (1971) 4 Cal.3d 725, 733 [94 Cal.Rptr. 623, 484 P.2d 599, 47 A.L.R.3d 224], should be applied here. Although *Hrnjak* was concerned with the collateral source rule, a similar issue is presented in this case. (See, Jefferson, Cal. Evidence Benchbook (1972) § 21.1.)

[3]For example, feasibility could have been proven by offering evidence that other manufacturers produced vehicles with a malleable iron steering gear box prior to the accident. The plaintiff introduced evidence that International Harvester had installed the malleable iron steering gear box on some vehicles prior to the accident. This evidence was reasonably convenient and could have proven feasibility.

—whether the aluminum steering gear box *actually caused* the injury—was closely balanced. In the first trial, the jury was unable to reach a verdict. During the second trial, plaintiff's trial tactics included constant emphasis of the subsequent change in the steering gear box, resulting in a plaintiff's verdict. Under these circumstances, it must be concluded the improper admission of evidence substantially affected the verdict, constituting reversible error.

Appellant's petition for a rehearing was denied January 23, 1975, and the opinion was modified to read as printed above. Clark, J., was of the opinion that the petition should be granted.